**In re DIXIE BROADCASTING, INC. and Martin Broadcasting of Alabama, Inc., Debtors.**

**BARCLAYS–AMERICAN/BUSINESS CREDIT, INC., Plaintiff–Appellant,**

**Dixie Broadcasting, Inc. and Martin Broadcasting, Plaintiffs–Appellants,**

v.

**RADIO WBHP, INC., Defendant–Appellee.**

No. 88–7035.

United States Court of Appeals,
Eleventh Circuit.

April 28, 1989.

Arent, Fox, Kintner, Plotkin & Kahn, William B. Sullivan and Joel D. Rubin, Washington, D.C., Lanier, Shaver & Herring, P.C., John M. Heacock, Jr., and Bell, Richardson & Sparkman, P.A., Tazewell T. Shepard III, Huntsville, Ala., for plaintiffs-appellants.

Berkowitz, Lefkovits, Isom & Kushner, John P. Whittington, Susan Salonimer Wagner, Birmingham, Ala., and Watts, Salmon, Roberts, Manning & Noojin, and Charles E. Richardson, III, Huntsville, Ala., for defendant-appellee.

Before RONEY, Chief Judge, JOHNSON, Circuit Judge, and TIDWELL,* District Judge.

RONEY, Chief Judge:

This is an appeal by two debtor corporate owners of a radio station, and its secured creditor, from a bankruptcy court order lifting the automatic stay of 11 U.S.C.A. § 362, which was affirmed by the district court. The removal of the stay cleared the way for continuation of state court litigation in which another radio station sought specific performance by the debtors of a contract to sell their station. Also under attack is the district court's order remanding the case to the bankruptcy court for a determination of whether the debtors filed

* Honorable G. Ernest Tidwell, U.S. District Judge for the Northern District of Georgia, sitting by designation.

the bankruptcy petition in bad faith for purposes of dismissal. We affirm the order lifting the stay, but dismiss the appeal from the remand order for lack of jurisdiction.

*Background*

Debtor-appellant Dixie Broadcasting, Inc. is the owner of radio stations WHOS–AM and WDRM–FM in Decatur, Alabama. Debtor-appellant Martin Broadcasting of Alabama, Inc. was formed for the sole purpose of acquiring Dixie stock and is its sole shareholder. Donald G. Martin and J. Mack Bramlett are the president and vice-president of both Dixie and Martin. Martin and Bramlett also have engaged in other businesses together, including coal mining and leasing of coal mining equipment through various corporations and joint ventures, and they control other radio and television stations in Vermont and Alabama.

Appellee Radio WBHP is a "stand alone" AM radio station broadcasting out of Huntsville, Alabama, and is owned by W.H. Pollard, Jr. After on-and-off negotiations for a period of three years, Dixie entered into a Memorandum of Agreement on April 11, 1984, to sell WDRM to WBHP for $925,000. A Purchase and Sale Agreement was executed on May 17, 1984. Despite the executed purchase and sale agreement, Dixie apparently continued to entertain other offers to purchase the station. Colonial Broadcasting Co., which had offered to buy WDRM in 1983 for $875,000, purportedly upped its price to $1.25 million in June 1984. Dixie then refused to join WBHP in its application for a transfer of the FCC license from WDRM to WBHP, as required in the agreement. Dixie's attorney wrote to WBHP that the reason Dixie could not join in the application was that appellant Barclays–American/Business Credit, Inc., a secured creditor of Dixie, had refused to consent to the sale of the station.

Barclays was a secured creditor by virtue of a May 10, 1984, security interest executed by Dixie which extended and amended a prior loan guarantee with a principal of $1 million secured by all of the real and personal property of Dixie, both tangible and intangible, used in connection with the station, including the FCC license and 100 percent of the issued and outstanding Dixie capital stock. This agreement, executed after Dixie and WBHP had completed their memorandum of agreement on April 11, but before the final purchase and sale agreement of May 17, gave Barclays the right to withhold consent to the sale of Dixie's assets. The loan for which Dixie executed the security agreement was for Martin's and Bramlett's coal mining and related operations.

When WBHP heard of the Colonial offer, it filed suit against Dixie and Martin in an Alabama circuit court. This court enjoined Martin and Dixie from transferring WDRM to anyone other than WBHP and later entered partial summary judgment for WBHP, ordering Dixie to join with it in an FCC application. Several months later, the court vacated the partial summary judgment in response to Dixie's and intervenor Barclay's motion suggesting the court had failed to consider Barclay's security interest when it entered the summary judgment. The court then directed WBHP to seek a declaratory ruling before the FCC.

WBHP sought reconsideration of the court's order. After a two-hour argument on this motion in a December 5, 1986 hearing, the court told the parties that it was ready to rule in WBHP's favor, but that it needed to recess the hearing for a few hours and ordered the parties to meet during this time to try to settle the litigation. The parties did meet and for the first time, the debtors mentioned the potential of filing for bankruptcy. No resolution was reached and the parties resumed negotiations during a January 30, 1987 meeting. It was during a lunch break in this negotiating session that Dixie and Martin filed for Chapter 11 bankruptcy.

WBHP sought dismissal of Dixie's petition, or in the alternative, relief from the automatic stay granted by section 362(a) of the Code. The bankruptcy court first found that because an FCC broadcasting license is not readily obtainable in the open market, and because there were no other

FCC FM broadcasting station licenses available in the North Alabama market, the license at issue here was unique and WBHP's interest could not be adequately protected while a stay was in effect. The court further found that Dixie filed its petition:

> [F]or the primary purpose of (1) avoiding the consequences of an anticipated adverse state court decision; (2) relitigating the same controversy between the two parties in bankruptcy forum; and (3) invoking the automatic stay provision to evade the pending state court litigation.

Order Terminating Stay at 15. The court noted that the litigation had been pending for two and one-half years and was on the verge of completion when Dixie filed its petition "in order to obtain a last-minute escape chute out of the civil litigation." *Id.* The court concluded that Dixie's actions amounted to bad faith and justified relief from the stay.

On appeal, the district court stated that it had reviewed the order, was convinced that it was correct and that the stay was due to be lifted. Nevertheless, the court remanded the case back to the bankruptcy court for further proceedings on the bad faith filing issue. Although reciting numerous facts such as the timing of events, the financial health of Dixie, and the debt which Dixie secured but received no benefit from, which "more than merely intimate a bad faith filing," the court found that the "motive, intent and need" of the debtors was still subject to question. Thus, the bankruptcy court was instructed to hold a hearing and make a finding as to the debtors' good faith in filing the petition. The court further instructed the bankruptcy judge to dismiss the petition should he find bad faith.

### The Automatic Stay

Under 28 U.S.C.A. § 158(d), the federal appellate courts have jurisdiction in bankruptcy cases over "appeals from all final decisions, judgments, orders, and decrees" of the district courts. A district court order affirming or reversing the bankruptcy judge's grant or denial of relief from an automatic stay consistently has been held by the courts to be a final decision reviewable on appeal. *See, e.g., In re Regency Woods Apartments, Ltd.,* 686 F.2d 899, 902–03 (11th Cir.1982); *In re Sun Valley Foods Co.,* 801 F.2d 186, 190 (6th Cir.1986); *In re Boomgarden,* 780 F.2d 657, 659–60 (7th Cir.1985); *Grundy Nat'l Bank v. Tandem Mining Corp.,* 754 F.2d 1436, 1439 (4th Cir.1985); *In re American Mariner Indust., Inc.,* 734 F.2d 426, 429 (9th Cir. 1984); *In re Leimer,* 724 F.2d 744, 745 (8th Cir.1984); *In re Comer,* 716 F.2d 168, 172 (3d Cir.1983); *In re Taddeo,* 685 F.2d 24, 26 n. 4 (2d Cir.1982).

An automatic stay may be terminated for "cause" pursuant to section 362(d)(1) of the Bankruptcy Code. The statute specifically provides that "the lack of adequate protection of an interest in property" is cause to lift a stay. Further, a petition filed in bad faith also justifies relief from a stay. *In re Natural Land Corp.,* 825 F.2d 296 (11th Cir.1987). A decision to lift the stay is discretionary with the bankruptcy judge, and may be reversed only upon a showing of abuse of discretion. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 814 F.2d 844 (1st Cir.1987); *In re Holtkamp,* 669 F.2d 505 (7th Cir.1982).

The bankruptcy court found both that WBHP's interest was inadequately protected given the unique character of an FCC license and that Dixie's actions amounted to bad faith. On appeal, Dixie argues that WBHP's unsecured, prepetition and unliquidated contract claim is not entitled to adequate protection, but that it nonetheless is protected because the value of the radio station has steadily increased. WBHP does not address the adequate protection argument, contending that the presence of bad faith alone compels relief from the stay in this case.

We hold that the bankruptcy court did not err in its determination that there was bad faith to justify lifting the stay. The evidence of bad faith in this case includes:

(1) the filing of the petition during a lunch recess in eleventh-hour court or-

dered settlement negotiations in the state court litigation;

(2) use of bankruptcy proceedings despite the apparent good financial health of the debtor;

(3) use of bankruptcy to avoid a contract that had become less profitable in light of a better purchase offer;

(4) execution of a security agreement giving Barclays the right of consent to a sale of Dixie's assets on May 10, 1984, *after* Dixie and WBHP had entered into a Memorandum of Agreement to sell the station, and just one week prior to execution of the Purchase and Sale Agreement;

(5) use of Dixie's assets to secure a loan which benefited some of Donald Martin's other enterprises and the sale of one of these enterprises on which Barclays had a collateral assignment and lien at the same time Dixie entered into the security agreement; and

(6) Mr. Bramlett's statements to creditors that the petition was filed as a "diversionary tactic" and that Dixie was not in financial distress.

Although there is no precise test for determining bad faith, courts have recognized factors which show an "intent to abuse the judicial process and the purposes of the reorganization provisions." *Natural Land,* 825 F.2d at 298. These factors include the timing of the filing of the petition, *id.;* whether the debtor is "financially distressed," *In re Waldron,* 785 F.2d 936, 939 (11th Cir.), *cert. dismissed sub nom. Waldron v. Shell Oil Co.,* 478 U.S. 1028, 106 S.Ct. 3343, 92 L.Ed.2d 763 (1986); whether the petition was filed strictly to circumvent pending litigation, *Holtkamp,* 669 F.2d at 508; and whether the petition was filed solely to reject an unprofitable contract, *Waldron,* 785 F.2d at 939–41. *See also Furness v. Lilienfield,* 35 B.R. 1006 (D.Md.1983) (petition dismissed which had been filed just prior to district court civil RICO trial after a continuance in the trial had been denied); *In re Wally Findlay Galleries (New York), Inc.,* 36 B.R. 849 (Bankr.S.D.N.Y.1984) (petition dismissed which was filed the same day judgment entered against debtor in state court); *In re Smith,* 58 B.R. 448 (Bankr.W.D.Ky. 1986) (petition dismissed where financially sound debtor filed to avoid posting a supersedeas bond in pending state court litigation).

In light of these factors, we find no error with the bankruptcy court's determination that Dixie and Martin filed their petition in bad faith to justify lifting the stay. Contrary to the arguments of Dixie and Barclays, neither the bankruptcy court nor the district court improperly seized upon any single factor in determining the existence of bad faith. Rather, the cumulative effect of all the evidence was appropriately considered. As both the bankruptcy court and the district court noted, the petition was filed when it appeared that a ruling adverse to Dixie was imminent in state court litigation that had been underway for more than two years. Moreover, the state court litigation arose because Dixie had received a better offer for its radio station and refused to perform an executed sales agreement for the station. It does not appear that Dixie was in financial distress and needed the protection of the bankruptcy court. It was substantially current on its debts and remained only secondarily liable on the Barclays loan which the debtors make much of. Its sales were increasing as the result of the relocation of a transmitter tower to a better site. Further, one year prior to the filing, Dixie began paying Martin a $5,000 per month consulting fee, and continued to pay more than $500 a month for a Lincoln Continental automobile which Martin used in Vermont. Dixie also paid $36,000 per year to Bramlett to manage the station and, about six months before the filing, increased Bramlett's wife's salary from $12,000 to $36,000 per year to keep the station's books. As the district court stated, "[t]hese facts are not indicative of a business in financial distress."

It seems clear that Dixie entered bankruptcy to get out of its bad deal. There was testimony that Mr. Bramlett told creditors that the petition was filed to prevent WBHP's purchase, that Dixie did not have financial problems, and that the petition

was filed as a "diversionary tactic." This Court has found similar comments as one factor leading to a finding of bad faith. *In re Phoenix Piccadilly,* 849 F.2d 1393 (11th Cir.1988).

■ The Bankruptcy Code is not intended to insulate financially secure sellers or buyers from the bargains they strike. Thus, we hold that the bankruptcy court's factual findings are supported by the record, and are not clearly erroneous, and its conclusion as to bad faith for this purpose was correct as a matter of law. *In re Fielder,* 799 F.2d 656 (11th Cir.1986). Having found that, it was not an abuse of discretion for the bankruptcy court to grant relief from the automatic stay.

Because of this Court's resolution of the bad faith issue, we need not decide whether WBHP's claim was entitled to adequate protection.

### *The Remand Order*

The parties, and apparently the district court, have treated the bankruptcy judge's order lifting the stay as an implicit denial of WBHP's motion to dismiss the bankruptcy petition. The district court had jurisdiction to consider the propriety of the denial because section 158(a) empowers it, unlike the courts of appeal, to review interlocutory, as well as final, orders of a bankruptcy court. *See In re Bertoli,* 812 F.2d 136 (3d Cir.1987) (denial of motion to dismiss adversary proceeding in Chapter 11 bankruptcy reviewable by district court without certification by bankruptcy judge).

■ Although the district court had authority to review the bankruptcy court's apparent denial of WBHP's motion to dismiss, we have no jurisdiction to review the resolution of that appeal. This Circuit has consistently held that a district court order remanding the case to the bankruptcy court is not a final decision for purposes of appeal. *In re Miscott Corp.,* 848 F.2d 1190 (11th Cir.1988); *In re Briglevich,* 847 F.2d 759 (11th Cir.1988); *In re TLC Investors,* 775 F.2d 1516 (11th Cir.1985); *In re Regency Woods Apartments Ltd.,* 686 F.2d 899 (11th Cir.1982). In *Miscott,* this Court refused to entertain an appeal of a district

court order which affirmed the bankruptcy court's determination of damages, but which included a remand to the bankruptcy court for further proceedings on the issue of attorneys' fees. The Court noted that an order including a remand may be considered final if "all that remains is the performance of a ministerial duty." 848 F.2d at 1192. (citations omitted.) However, the Court concluded that a determination of whether a bona fide settlement offer was made and rejected, entitling the offeror to an award of attorneys' fees, was more than a ministerial duty. In *Briglevich,* this Court dismissed an appeal from a district court order which included a remand requiring the bankruptcy court to redetermine damages under a construction contract, holding that the remand required "significant proceedings" and thus, was not final. 847 F.2d at 761. Similarly in *TLC,* this Court held that it had no jurisdiction to review a district court remand to the bankruptcy court which instructed that court to conduct an adversary hearing on the question of whether a bankrupt would be required to sell certain property. Because the district court order "in no way determine[d] the merits of the case or any of the substantive rights of the parties," no appeal could be entertained. 775 F.2d at 1519.

Other circuits are in accord with this view. *See In re Bowman,* 821 F.2d 245 (5th Cir.1987) (district court order reversing bankruptcy court's dismissal of complaint and remanding for consideration of merits not final appealable order); *In re Ben Hyman & Co., Inc.,* 577 F.2d 966 (5th Cir.1978) (remand order for determination whether one creditor entitled to exercise a right of setoff not final order and not appealable); *In re Stanton,* 766 F.2d 1283 (9th Cir.1985) (remand to bankruptcy court for further factual findings in reconsideration of dismissal of counterclaim not a final, appealable order); *In re Riggsby,* 745 F.2d 1153 (7th Cir.1984) (remand to bankruptcy court for reconsideration under proper standard whether late filing of complaint was permissible was not final).

Other circuits have taken a different position, however. The leading case is *In re Marin Motor Oil, Inc.,* 689 F.2d 445 (3d Cir.1982), *cert. denied,* 459 U.S. 1207, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983), where the court held that a district court order reviewing, and even remanding, a final order of a bankruptcy court is final for purposes of section 158(d). *In re Gardner,* 810 F.2d 87 (6th Cir.1987) (reversal on question of insurance coverage and remand to bankruptcy court for determination as to whether a release was fraudulent was appealable order.) *See also In re Christian,* 804 F.2d 46 (3d Cir.1986) (district court order affirming bankruptcy court's denial of motion to dismiss is final for purposes of appeal).

The debtors argue that the Court should review the entire district court order because the central issue is the same for both portions of the order, that is, bad faith. They contend that the district court erred when it found bad faith for purposes of relief from the stay, but remanded to the bankruptcy court for consideration of bad faith for purposes of dismissing the petition. Their argument has merit only if it is indeed the case that once a bankruptcy court determines there is bad faith sufficient to justify relief from the automatic stay it must also dismiss the petition.

■ We disagree that bad faith constituting "cause" for relief from a stay automatically equates to bad faith warranting dismissal of the petition. If that were true, there would not be a need to ever lift a stay for bad faith, because the petition would necessarily have to be dismissed. That seems at odds with the intent of the Bankruptcy Code. It is at least inconsistent with the practice in many courts which have lifted a stay on a finding of bad faith but which nonetheless permit the petition to be maintained. *See, e.g., In re RAD Properties, Inc.,* 84 B.R. 827 (Bankr.M.D. Fla.1988); *In re Choctaw Boundary Farms, Inc.,* 72 B.R. 638 (Bankr.S.D.Miss. 1987).

That the bankruptcy court has seen fit to grant relief from the stay is not equivalent to a decision by that court that Dixie may not maintain its petition. Rather, the decision on whether to grant or deny relief from an automatic stay may be analogized to a decision whether or not to grant preliminary injunctive relief. The fact that preliminary relief is obtained does not mean that permanent relief also must be forthcoming. *University of Texas v. Camenisch,* 451 U.S. 390, 394–95, 101 S.Ct. 1830, 1833–34, 68 L.Ed.2d 175 (1981) (decisions on preliminary injunctions are not "tantamount to decisions on the underlying merits"); *McArthur v. Firestone,* 817 F.2d 1548 (11th Cir.1987) (district court's denial of temporary restraining order did not constitute decision on merits of First Amendment claim.). Likewise here, the purposes and considerations that weigh in the determination of relief from a stay are distinct from the inquiry into whether the proceeding may be maintained at all.

A panel of this Court stated in dicta in *In re Phoenix Piccadilly, Ltd.* that "what amounts to bad faith is the same for both proceedings." 849 F.2d at 1394. We interpret that statement to mean that the factors used to demonstrate bad faith are the same in both contexts, but that a bankruptcy judge may nonetheless take into consideration the number of factors and their certainty in determining whether they constitute bad faith for dismissal purposes. Thus, on remand, the bankruptcy court must engage in this evaluative process. This involves more than ministerial duties and, accordingly, the district court's remand order cannot be considered a final, appealable decision.

### *The "Ghostwritten" Order*

Finally, appellants contend that the appeal should be dismissed, or the case remanded for further factual determinations, because the district court's order was allegedly "ghostwritten" by counsel for WBHP. This contention is not supported by the record.

This Circuit and other appellate courts have condemned the ghostwriting of judicial orders by litigants. *In re Colony Square Co.,* 819 F.2d 272 (11th Cir.1987); *cert. denied,* —— U.S. ——, 108 S.Ct. 1271, 99 L.Ed.2d 482 (1988); *Keystone Plastics,*

*Inc. v. C & P Plastics, Inc.*, 506 F.2d 960 (5th Cir.1975); *Bradley v. Maryland Casualty Co.*, 382 F.2d 415 (8th Cir.1967). In *Colony Square*, this Court noted that the dangers of ghostwriting are obvious. "When an interested party is permitted to draft a judicial order without response by or notice to the opposing side, the temptation to overreach and exaggerate is overwhelming." 819 F.2d at 275. In that case, the judge called counsel for the party for whom the judge intended to rule and asked counsel to draft the order. Opposing counsel was not notified of these *ex parte* contacts nor apprised that the opinion had been drafted by the other side.

■ Although this Court in *Colony Square* was highly critical of the practice, it nevertheless refused to find that the order was *per se* invalid. Rather, such orders will be vacated only if a party can demonstrate that the process by which the judge arrived at them was "fundamentally unfair." *Id.* at 276. In that case, the Court concluded that the orders at issue were not subject to being vacated because it was clear that the judge had reached a firm decision before asking counsel to draft the orders and directed counsel to address specific points and reach a particular result.

The record here lends even less support for vacating the bankruptcy court order. Unlike *Colony Square*, the bankruptcy court made no secret of the request for a draft order, noting in open court in the presence of all counsel that he had asked WBHP counsel to draft an order because his secretary was out on sick leave. Neither Barclays nor the debtors requested to review the draft or to have an opportunity to make objections to it. Further, it is clear that the parties had ample opportunity to argue their case in the bankruptcy court through extensive briefs and oral argument and the district court also gave the case "independent consideration and analysis" which "serve[d] to correct any errors in the procedures used by the bankruptcy judge." *Colony Square*, 819 F.2d at 277.

AFFIRMED IN PART, DISMISSED IN PART.